IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CORAZON MEDICAL, LLC, §
§
Plaintiff, §
§
v. § 1:24-CV-886-RP
§
CORCYM INC., §
§
Defendant. §

## ORDER

Before the Court is Plaintiff Corazon Medical, LLC's ("Plaintiff") Corrected Motion for

Summary Judgment, (Dkt. 48), and Plaintiff's Motion for Leave to Amend Complaint, (Dkt. 50), as

well as all responsive briefing, (Dkts. 49, 51, 52). Having considered the parties' submissions, the

record, and the applicable law, the Court will deny in part Plaintiff's Motion for Summary Judgment,

(Dkt. 48), and deny Plaintiff's Motion for Leave to Amend Complaint, (Dkt. 50).

## I. BACKGROUND

### A. The Underlying Contract

This is a breach of contract action brought by Plaintiff against Defendant Corcym Inc.

("Defendant"). Plaintiff, whose sole member is Scott Weaver ("Weaver"), was "contracted by

Defendant's predecessor in interest Biostable Science & Engineering, Inc. ('BSE') as a

Representative beginning on July 31, 2017" ("the Contract" or "the Representative Agreement"). (2d

Am. Compl., Dkt. 17, at 2; Rep. Agr., Dkt. 48-1). BSE sold "aortic valve repair rings known as

HAART devices." (Horton Decl., Dkt. 49-2, at 4). Under the Contract, Plaintiff would act as BSE's

Representative in a specified geographic area "to promote and solicit sales" of HAART devices.

(Rep. Agr., Dkt. 48-1, at 5). Plaintiff would sell the HAART devices to physicians who wanted to

perform surgery using the device. (Weaver Aff., Dkt. 48-1, at 1). These physicians would be aided by

1

a "proctor," who was a doctor with "prior skill and knowledge implanting the device, to train, oversee and assist the[m] during the surgeries." (*Id.* at 1–2).

Primarily at issue in this action are the following contractual provisions:

**2.4 Sales Objectives.** BSE and [Plaintiff] have established yearly sales objectives for the [HAART devices] in each Territory. Such sales objectives are set forth in the attached Exhibit C.[1] Prior to the beginning of any year for which sales objectives have not been established under this Agreement, BSE and [Plaintiff] shall mutually agree in writing on the sales objectives for such year, and each such written agreement shall be deemed a part of this Agreement. If the parties do not agree on annual sales objectives for the Territory for any year, then the annual sales objectives for such Territory shall be no greater than 130% of the actual purchases for such Territory for the preceding year.

**6.1 Compliance with Laws.** . . . [Plaintiff] will further comply with all applicable laws and regulations in each Territory in which it has the right to promote the sale of the [HAART devices], including the Foreign Corrupt Practices Act and any similar law or regulation. BSE and [Plaintiff] will cooperate where appropriate in order to assure compliance of both parties with such laws and regulations.

(Rep. Agr., Dkt. 48-1, at 7, 13). The Contract further provides that "[a]ny breach of any of the terms of conditions of . . . Section 6.1 (Compliance with Laws)" or "[t]he failure by [Plaintiff] to meet its yearly sales objective (see Section 2.4 and Exhibit C)" are an "Event of Default" under the Contract, such that the "non-defaulting party may terminate the Agreement immediately upon written notice of termination to the defaulting party." (Rep. Agr., Dkt. 48-1, at 18–19).

The Contract automatically renewed every two years pursuant to a provision stating that the contract would automatically renew every two years unless a party gave written notice of termination at least ninety days prior to the end of the term. (Rep. Agr., Dkt. 48-1, at 5–6; Weaver Aff., Dkt. 48-1, at 1). The most recent contract term renewed on August 1, 2023, and was set to expire July 31, 2025. (Weaver Aff., Dkt. 48-1, at 1). In May 2023, Defendant acquired BSE. (Horton Decl., Dkt. 49-

---

[1] Exhibit C to the Contract provided that the sales objective for "Year One" would be $55,000 and for "Year Two" would be $145,000." (Ex. C to Contract, Dkt. 48-1, at 29). Exhibit C further provides: "Additional renewal years: To be mutually determined." (*Id.*).

2, at 4). As part of that acquisition, Defendant "inherited several independent representatives that BSE had contracted with to sell the HAART device," including Plaintiff. (*Id.* at 5).

### B. The Parties' Dispute

In May 2024, Defendant gave written notice to Plaintiff terminating the Contract. (Termination Notice, Dkt. 48-1, at 32; Horton Decl., Dkt. 49-2, at 9). According to Defendant's Senior Vice President, Christopher Horton ("Horton"), Defendant chose to terminate the Contract "[b]ecause of [Plaintiff's] violations of Section 2.4 and 6.1." (Horton Decl., Dkt. 49-2, at 8). Regarding the claimed violation of Section 2.4 ("Sales Objectives"), Horton states that Plaintiff's "sales . . . declined over time, and even more rapidly in 2023 and 2024," due to Plaintiff's sales territory being reduced in 2023 and due "the overall trend of declining sales for HAART devices." (Horton Decl., Dkt. 49-2, at 5). Horton declares that Plaintiff's "sales goal for January 1, 2023 through December 31, 2023 was $793,000.00," which Defendant "determined . . . by reviewing [Plaintiff's] 2022 sales of $610,000.00 and multiplying it by 130% as permitted in Section 2.4."[2] (*Id.* at 5). Given that Plaintiff's sales from January 1, 2023, through December 31, 2023, were $522,000.00, Defendant asserts that Plaintiff fell short of its 2023 sales goal. (*Id.*; Resp. to Mot. Summ. J., Dkt. 49, at 6). On the other hand, Plaintiff contends that it did not fail to meet the yearly sales quota: "[T]he plain language of the Contract as written only limits the sales objective to any figure below or up to 130% of the preceding year," such that "no such sales objective existed."[3] (Mot. Summ. J., Dkt. 48, at 6; Weaver Aff., Dkt. 52-2, at 1; Reply to Mot. Summ. J., Dkt. 52, at 1).

---

[2] Plaintiff and Defendant agree that they did not "mutually agree on a sales goal for 2023." (Resp. to Mot. Summ. J., Dkt. 49; Weaver Aff., Dkt. 48-1, at 10; Weaver Aff., Dkt. 52-2, at 1).

[3] Weaver also contends that, when Plaintiff and BSE signed the Contract, a "year" for the purposes of the Contract was August 1–July 31. (Weaver Aff., Dkt. 48-1, at 2). He further contends that Defendant "changed those parameters to the calendar year . . . i.e., January 1 to December 31 . . . without [Plaintiff's] consultation or agreement." (*Id.*).

Additionally, Plaintiff and Defendant had a dispute in 2023 and 2024 regarding the use of a certain proctor, which Defendant claims amounted to a violation of Section 6.1 of the Contract ("Compliance with Laws"). (Weaver Aff., Dkt. 48-1, at 2; Horton Aff., Dkt. 49-2, at 6; Email Chain, Dkt. 49-5, at 2–4; Email Chain, Dkt. 49-8, at 2). According to Plaintiff, the "preferred proctor among the customer/physicians was Dr. J Scott Rankin, ('Dr. Rankin'), the inventor and developer of the device." (Weaver Aff., Dkt. 48-1, at 2). "In late 2023, Dr. Rankin's contract with [Defendant] ran out," and Plaintiff "had to advise the customer/physicians that Dr. Rankin was unavailable" to be the proctor for surgeries. (*Id.*). Weaver declared that Dr. Rankin being unavailable "dissatisfied many of [his] customer/physicians who expressed their disappointment and sometimes anger at being unable to utilize Dr. Rankin." (*Id.*).

According to Defendant, Plaintiff "was . . . in violation of Section 6.1 of the [Representative] Agreement for [its] clear preference for and repeatedly relying on the same proctor, Dr. Scott Rankin, for all of the HAART device implantations despite the fact that [Defendant] instructed [Plaintiff] that [Defendant] had several other proctors to oversee surgeries and that Dr. Rankin could not proctor all surgeries." (Horton Decl., Dkt. 49-2, at 6). Defendant asserts that Plaintiff's preference for Dr. Rankin "was not aligned with the [AdvaMed Code of Ethics U.S. (the 'AdvaMed Code')] and opened [Defendant] up to liability and compliance with anti-kickback statutes." (*Id.* at 8). The AdvaMed Code "is the industry standard for medical technology and governs the best ethical practices for businesses interacting with healthcare providers and professionals." (*Id.* at 3). Horton states that the AdvaMed Code is known in the industry as "the best way to ensure there are no violations of federal or state laws or regulations, such as the U.S. Federal Anti-Kickback Statute." (*Id.*). For example, the AdvaMed Code states that "sales personnel cannot control or unduly influence the decision to engage a particular health care professional as a consultant." (*Id.*).

Horton declares that Plaintiff was "aware of [Defendant's] policies and procedure" put into place to "ensure compliance with AdvaMed Code" and that he spoke with Weaver "several times . . . . stress[ing] the importance of adherence to [Defendant's] policies and procedures . . . [to] ensure [Defendant] does not violate any laws or regulations in accordance with governing agencies." (*Id.* at 4, 7). For its part, Weaver affirms that Plaintiff was "never out of compliance with any laws or regulations applicable to the Contract or the sale of the HAART devices." (Weaver Aff., Dkt. 48-1, at 3).

Plaintiff has now moved for summary judgment on its breach of contract claim and its purported damages, which Plaintiff calculates as $304,368.96. (Mot. Summ. J., Dkt. 48, at 8). Plaintiff also states that it will separately pursue attorney's fees and costs through Federal Rule of Civil Procedure 54(d). (*Id.*).

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Where the movant "bears the burden of proof at trial, it must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (citation omitted). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

### B. Motion to Amend Pleading

"Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired." *S&W Enterprises, L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003) (citing Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.")). "The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Id.* at 535 (quoting 6A Charles Alan Wright et al., Federal Practice and Procedure § 1522.1 (2d ed. 1990)). The Fifth Circuit considers four factors to evaluate whether a district court's refusal to modify a scheduling order constitutes an abuse of discretion: "(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice." *S&W Enterprises,*

315 F.3d at 536 (citations and internal quotation marks omitted)."If a party shows good cause for missing the deadline, then the 'more liberal standard of Rule 15(a) will apply to [a motion for] leave to amend.'" *Filgueira v. U.S. Bank Nat. Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013) (quoting *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008)).

### III. DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

The elements for a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

Plaintiff has "come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *See Int'l Shortstop*, 939 F.2d at 1264–65. First, no party disputes that the Contract is a valid contract. Second, Plaintiff has submitted affidavits from its sole member swearing that it "was never out of compliance with any laws or regulations applicable to the Contract or the sale of the HAART device," such that it "did not violate . . . section 6.1 of the Contract" and that "[b]eyond the first two years of the Contract, [BSE] set no sales objectives of any kind relating to Plaintiff," including for 2023. (Weaver Aff., Dkt. 48-1, at 3; Weaver Aff. Dkt. 52-2, at 1). Accordingly, regarding the third element, Plaintiff has met its initial burden to provide evidence that Defendant breached the contract by terminating it prior to the end of the Contract's term because no "Event of Default" occurred to allow Defendant to properly terminate the contract in May 2024.

Finally, Plaintiff has submitted an affidavit and earnings documents to support its damages for lost profits and a service fee. (Weaver Aff., Dkt. 48-1, at 3–4; Damages Worksheet, Dkt. 48-1, at

34–37). Weaver swears that Plaintiff "would have continued its efforts to sell the HAART device had [Defendant] not terminated the Contract" and that Plaintiff was projected to earn $167,988.96 for the remainder of the Contract term. (Weaver Aff., Dkt. 48-1, at 3–4). Section 10.4 of the Contract provides:

> No party terminating this Agreement in accordance with its terms shall, because of such termination, be liable to the other for compensation, reimbursement or damages on account of loss of profits on sales or estimated profits on anticipated sales or on account of expenditures, investments or commitments made in connection with the business or goodwill of the other party and neither party shall have such claim upon the expiration of this Agreement.

(Rep. Agr., Dkt. 48-1, at 20). Given that Plaintiff has met its initial burden to show that Defendant terminated the Contract prior to the term's end and without an Event of Default occurring, Plaintiff has demonstrated that Defendant did not terminate the Contract "in accordance with its terms," such that Plaintiff has met its initial burden to show it may recover lost profits.[4] Accordingly, Plaintiff has met its initial burden on all four elements of its breach of contract claim.

The burden now shifts to Defendant to raise a genuine dispute of material fact. *See Westphal*, 230 F.3d at 174. Defendant contends that it was entitled to immediately terminate the agreement because Plaintiff breached both Sections 2.4 ("Sales Objectives") and Sections 6.1 ("Compliance with Law"). (Resp. to Mot. Summ. J., Dkt. 49, at 11–15). Regarding whether Plaintiff met its sales objectives for 2023, Defendant points to Section 2.4 of the Contract and argues that it "requires [Plaintiff] to have a yearly sales objective." (*Id.* at 14). According to Defendant, because there was no agreement between the parties regarding a sales objective,[5] "[Plaintiff's] sales objective defaults to 130% of actual sales in the preceding year." (*Id.*) (citing Rep. Agr., Dkt. 48-1, at 7) ("If the parties do

---

[4] *See Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 826 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citation omitted) ("When a plaintiff is prevented from performing a contract, 'lost profits are generally an appropriate measure of damages so long as the evidence provides a basis for determining, with reasonable certainty, what the profits would have been had the contract not been breached.'").

[5] The parties agree that there was no agreement regarding a sales objective for 2023.

not agree on annual sales objectives for the Territory for any year, then the annual sales objectives for such Territory shall be no greater than 130% of the actual purchases for such Territory for the preceding year."). Because Plaintiff's sales were 34% lower in 2023 than in 2022, (Horton Decl., Dkt. 49-2, at 4), Defendant contends that Plaintiff did in fact breach Section 2.4 of the Contract, thereby allowing Defendant to terminate the Contract immediately.

Plaintiff replies that, to the contrary, the Contract "does *not* say that the objective *must* be 130% of the preceding year. In fact, the plain language . . . only limits the sales objective to *any* figure below or up to 130% of the preceding year." (Reply to Mot. Summ. J., Dkt. 52, at 1) (emphasis in original). Plaintiff asserts that there was no sales objective for 2023. (*Id.* at 2; Weaver Aff., Dkt. 52-2, at 1).

Based on these arguments, the Court must interpret Section 2.4 of the Contract and resolve any doubts in favor of Defendant as the nonmovant. To determine the meaning of contractual terms, Texas courts focus on the parties' intentions as expressed in the contract itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "Language used by the parties . . . should be accorded its plain grammatical meaning unless it definitely appears that the intentions of the parties would be thereby defeated." *Kline v. O'Quinn*, 874 S.W.2d 776, 782 (Tex. App.—Houston [14th Dist.] 1994, writ denied), *as supplemented on denial of reh'g* (May 12, 1994) (citing *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985)). Courts must "avoid, when possible and proper, a construction which is unreasonable, inequitable and oppressive." *Id.* (citing *Reilly v. Rangers Management Inc.,* 727 S.W.2d 527, 530 (Tex. 1987)). When a contract can be given a "certain or definite legal meaning or interpretation," courts are to construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (citation omitted). But, when a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning," the contract is ambiguous and must be interpreted by the factfinder. *Id. See also ConocoPhillips Co. v. Koopmann*, 547

9

S.W.3d 858, 874 (Tex. 2018) ("If the contract is subject to two or more reasonable interpretations . . . the contract is ambiguous, creating a fact issue on the parties' intent.").

The Court finds that, drawing all inferences and resolving all doubts in favor of Defendant, the plain language of Section 2.4 would defeat the intentions of the contracting parties. The parties explicitly contracted to include a mandatory yearly sales objective for Plaintiff. (*See* Rep. Agr., Dkt. 48-1, at 7) (using the term "shall" to describe the creation of yearly sales objectives). But requiring that the "annual sales objectives . . . shall be *no greater than 130% of the actual purchases . . . for the preceding years*" would essentially make the sales objective provision meaningless. Taking this phrase to its extreme, Plaintiff selling even 0% of its previous year's sales would satisfy this condition, as 0% is "no greater than 130%." As Defendant put it, "[t]here is no reasonable basis to assume that the parties would agree to a <u>downward</u> adjustment year after year." (Resp. to Mot. Summ. J., Dkt. 49, at 14 n.14). Thus, resolving all doubts in favor of Defendant, the meaning of Section 2.4 is "doubtful," such that it is ambiguous. *See Coker*, 650 S.W.2d at 393. Because the meaning is ambiguous, interpretation of the last sentence of Section 2.4 must be left to a jury. *See ConocoPhillips*, 547 S.W.3d at 874. The Court will therefore deny Plaintiff's motion for summary judgment, as Defendant has raised a fact issue as to whether Plaintiff was in breach of Section 2.4 of the Contract.[6]

Next, Defendant raises that Plaintiff failed to comply with the AdvaMed Code, such that Plaintiff "failed to comply with applicable laws and regulations." (Resp. to Mot. Summ. J., Dkt. 49, at 11). Plaintiff replies that the AdvaMed Code "do[es] not constitute law or regulations, i.e., [it does] not carry penalties or the force of law." (Reply to Mot. Summ. J., Dkt. 52, at 2). Plaintiff also points

---

[6] If a jury finds that Plaintiff did in fact breach Section 2.4, Defendant had the right to automatically terminate the Contract. (Rep. Agr., Dkt. 48-1, at 18–19).

out that the parties do not "specifically reference the AdvaMed Code of Ethics in the original Contract or any amendments thereto." (*Id.*).

The Court agrees with Plaintiff that no reasonable factfinder could interpret Section 6.1's reference to "laws and regulations in each Territory" to include a code of ethics an organization voluntarily chooses to follow. A "law" is defined as a "statute," the "aggregate of legislation, judicial precedents, and accepted legal principles," or a "set of rules or principles dealing with a specific area of a legal system." LAW, Black's Law Dictionary (12th ed. 2024). A "regulation" is defined as an "official rule or order, having legal force, usu[ally] issued by an administrative agency." REGULATION, Black's Law Dictionary (12th ed. 2024). The AdvaMed Code falls within neither of these categories. Moreover, though Defendant contends that compliance with the AdvaMed Code is used to ensure compliance with federal and local laws and regulations, Defendant provides no competent summary judgment evidence to support that Plaintiff violated a specific federal or local law or regulation. Accordingly, finding it appropriate to narrow the scope of trial, the Court will grant summary judgment to Plaintiff on the issue of whether Plaintiff violated Section 6.1 of the Contract.[7] *See Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) ("Summary judgment, pursuant to the simple procedures established by Rule 56, serves, among other ways, to root out, narrow, and focus the issues, if not resolve them completely. . . . [A] district judge must have considerable discretion in determining when enough is enough."); *Edwards v. Hartford Underwriters Ins. Co.*, No. 1:18-CV-370, 2019 WL 5790857, at *4 (E.D. Tex. Oct. 18, 2019), *report and recommendation adopted,* No. 1:18-CV-370, 2019 WL 5722111 (E.D. Tex. Nov. 4, 2019) ("Indeed, numerous courts

---

[7] The Court is not establishing that Plaintiff did in fact violate the AdvaMed Code. Rather, the Court has determined that—even if Plaintiff *did* violate the AdvaMed Code—such a violation is not a breach of Section 6.1 of the Contract.

11

have held that a district court may grant summary judgment on specific issues without granting summary judgment as to the entire cause of action in order to narrow the issues presented at trial.").

Because the Court is sending Plaintiff's breach of contract claim to a jury, it need not consider whether Plaintiff is entitled to summary judgment on its damages.

### B. Plaintiff's Motion for Leave to Amend Complaint

Defendant's response to Plaintiff's motion for summary judgment raises that the motion for summary judgment "is the *first time* that [Plaintiff] has requested such recovery," in violation of the Texas statute requiring a party to affirmatively plead attorney's fees under Chapter 38 of the Texas Civil Practices and Remedies Code. (Resp. to Mot. Summ. J., Dkt. 49, at 21) (emphasis in original). After Defendant filed its response, Plaintiff filed the instant Motion for Leave to Amend Complaint seeking leave to add a request for attorney's fees. (Mot. for Leave, Dkt. 50). The Scheduling Order in this case, (Dkt. 19), set the deadline for the parties to move for leave to amend pleadings as September 30, 2025; the instant motion was filed on February 19, 2026. (Sched. Order, Dkt. 19, at 1).

The motion for leave to amend, which is two-pages long (exclusive of the signature block, certificate of service, and attached documents), cites to Federal Rule of Civil Procedure 15 and argues that the "deadline to amend set by the Court [does not] bar this amendment, as the amendment neither adds a party nor does it add a claim." (Mot. for Leave, Dkt. 50, at 1). Plaintiff also contends that there is "no prejudice to Defendant, as it was already given adequate notice" as to the breach of contract claim for which Plaintiff would be receiving attorney's fees. (*Id.*).

As Defendant points out in its Response, (Dkt. 51), Plaintiff cites the wrong standard in its motion. Because the deadline to amend pleadings has passed—which, the Court notes, is not limited

to amending pleadings to add a claim or party[8]—Federal Rule of Civil Procedure 16(b)'s more stringent standard applies. As described in Section II(B), *supra*, Rule 16(b) requires the Plaintiff to show "good cause" for the late amendment before the "more liberal standard of Rule 15(a) appl[ies] to the district court's decision to grant or deny leave." *S&W Enterprises*, 315 F.3d at 536. Courts consider "(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice." *Id.* (citations omitted).

Notably, Plaintiff makes **no** attempt to show good cause. (*See* Mot. for Leave, Dkt. 50). There is no proffered "explanation for the failure" to timely move to leave to add a request for attorney's fees. Moreover, courts "routinely deny motions for leave to amend" when "leave to amend is sought after the summary judgment motion is filed." *Alexander v. Metrocare Servs.*, No. CIV.A. 308-CV-1398-D, 2009 WL 3378625, at *2 n.2 (N.D. Tex. Oct. 21, 2009) (citation omitted). Plaintiff has therefore not met its burden to show why the late amendment of its complaint should be allowed, and the Court will deny the motion for leave to amend.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment, (Dkt. 48), is **DENIED** in part, such that Plaintiff's motion for summary judgment on Defendant's liability and Plaintiff's damages is denied, except that it shall be considered established that Plaintiff did not violate Section 6.1 of the Contract by failing to comply with the AdvaMed Code.

---

[8] (*See* Agreed Scheduling Order, Dkt. 19, at 1) ("The parties shall file all motions to amend or supplement pleadings or to join additional parties on or before September 30, 2025.").

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Amend Complaint, (Dkt. 50), is **DENIED**.

**SIGNED** on April 17, 2026.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE